# NO. 12-20-00139-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *ANTHONY HENEGAR AND LORI HENEGAR, INDIVIDUALLY AND A/N/F MASON HENEGAR, DRUE HENEGAR AND MASON HENEGAR, APPELLANTS* | *§* | *APPEAL FROM THE 173RD* |
| | *§* | *JUDICIAL DISTRICT COURT* |
| *V.* | | |
| *REGAL MARINE INDUSTRIES, INC., ET AL, APPELLEES* | *§* | *HENDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Anthony Henegar and Lori Henegar, individually and as next friend of Drue and Mason Henegar (the Henegars) appeal the trial court's order granting summary judgment in favor of Regal Marine Industries, Inc., Rule Industries, LLC, Earmark, Inc., and Singleton Assets & Operations, LLC D/B/A Phil Dill Boats on the Henegars' claims for damages relating to personal injuries Anthony suffered in a boating collision. The Henegars raise eight issues for our consideration. We affirm.

## BACKGROUND

On July 22, 2016, Anthony, his teenaged daughter, Mason, Anthony's friends, Dan Mohorc and Larry Scala, and Dan and Larry's teenaged daughters went for a ride on Anthony's 2010 pleasure boat on Cedar Creek Lake. The group left the Henegars' lakehouse around 11 p.m. During the excursion, Anthony allowed the teenaged girls to take turns driving the boat.

Around 11:30 p.m., Larry's fifteen-year-old daughter, Sierra, was operating the boat when the party became lost, entered into a cove, and approached a bridge for Texas Highway 198. Larry took the helm from Sierra and attempted to guide the boat between the bridge's

pylons. Unfortunately, Larry misjudged the height of the bridge. He abruptly slowed the boat, which elevated the bow as the boat crashed into the bridge's undergirding. The impact shattered the windshield and severed the boat's tower arch. Anthony suffered a traumatic brain injury and Dan Mohorc was killed. After the collision, Mason attempted to guide Larry back to the Henegars' lakehouse, but was unable to, which prompted Larry to take the boat to the nearest dock. A good Samaritan assisted the group and called emergency services. Several law enforcement agencies, including Caney City Police Department, the Henderson County Sheriff's Office, and Texas Parks and Wildlife, responded to the scene. Larry was ultimately arrested for intoxication manslaughter, but the charges were later dropped.

The Henegars sued multiple defendants, including the boat manufacturer (Regal), boat seller (Dill), compass part manufacturer (Rule), and the manufacturer and installer of the boat's lighted tower speakers and underwater lights (Earmark)[1] under theories of strict products liability, negligence, gross negligence, fraud, and violations of the Deceptive Trade Practices Act.[2] Lori asserted a claim for loss of consortium. Mason, who intervened after turning eighteen, asserted a claim for loss of consortium and bystander injury. Drue, Anthony and Lori's other daughter, intervened and brought a loss of consortium claim.

It is undisputed that Larry, Anthony, and Dan consumed alcohol the night of the collision. All three also took alcohol on the boat. It is further undisputed that none of the boaters or passengers testified that any of the lights on the boat, which include the cockpit interior lights, lighted compass, navigation lights, and speaker tower lights, were illuminated at the time of the collision. And no witness testified that the boat's lighting features or other component parts affected their visibility while driving the boat. Mason, who drove the boat for a time prior to the collision, testified that she did not recall noticing any dash lights, a compass light, or whether the boat had a tower arch. She testified that, because it was dark outside, she did not see the bridge prior to the collision. Sierra testified that she drove the boat before her father took over the helm just prior to the collision. Sierra testified that she did not recall seeing any lights on in the boat and described the night as "completely dark." Sierra did not recall

---

[1] The Henegars sued several other defendants, including the manufacturer of the rearview mirror and the windshield. However, those claims have been dismissed and are not relevant to this appeal. Additionally, Appellants do not challenge the trial court's grant of summary judgment as to their claims for breach of warranty against Dill.

[2] *See* TEX. BUS. & COM. CODE ANN. § 17.50 (a) (West 2021).

anyone on the boat complaining of visibility issues. Larry testified that he did not recall any lights on the boat being illuminated at the time of the collision. He recalls the evening as "black as could be." Larry attributed his failure to appreciate the bridge's low clearance to the darkness of the night and the fact that the bridge was unlit. Anthony has no memory of the evening, but testified he did not activate the tower lights or cockpit lights when using the boat at night because the lights affected his vision and disturbed the neighbors.

The Henegars hired three experts in human visual perception and accident reconstruction. The experts opined that the boat's lighting features and windshield, along with passengers seated in the bow, caused visual issues which hindered Larry's ability to accurately perceive the bridge, and thus, proximately caused the collision.

All Appellees filed separate motions for traditional and/or no-evidence summary judgment. The trial court granted each motion and signed a final take nothing judgment in favor of each Appellee, resulting in the dismissal of all of the Henegars' claims. This appeal followed.

## THE EXPERT REPORTS

The factual bases for the Henegars' claims rest upon expert testimony that glare from the boat's compass and lighting features, as well as physical obstructions in the boat operator's line of sight, affected Larry's vision and caused him to misjudge the bridge's height, resulting in the collision. The Henegars rely on the testimony of three expert witnesses, Robert Swint, Jeffrey Andre, and Lila Lux, to establish the causation element of their claims. Swint has an electrical engineering degree and is an expert in the areas of accident reconstruction, boat testing, electrical systems, and human factors. Lux has a doctorate degree in industrial/organization psychology and a masters of science degree in applied psychology and is an expert in human factors and hazard/risk analysis. Andre has a doctorate degree in psychology and is an expert on human visual perception.

Swint, who inspected and tested the boat, noted the following defects:

1. The top of the windshield was located in Swint's field of view and produced a visual obstruction while seated at the boat's helm.

2. Seated occupants in the starboard bow seating area of the boat produced a visual obstruction to a clear field of vision forward.

3. Reflection off the inside surfaces of the operator station on the windshield was noted and limited clear forward vision for the operator.

4. When the navigation lights were turned on, he noted a reflection glare from the compass light onto the windshield in front of the operator which restricted clear forward visibility.

5. When the cockpit lights were turned on they reflected light through the cockpit areas. The degree of light would expect to produce excessive light and affect the operator's nighttime vision. [sic].

Swint took the boat to the Highway 198 bridge at night in dark conditions on two different occasions and made the following observations:

1. The compass becomes lighted when the navigation lights are turned on. The glare of the compass light on the windshield blocked the ability for the operator to see clearly forward. As the boat approached the bridge the glare prevented me from being able to distinguish the bridge.

2. I was required to rise above the windshield or move to my left to look through the walkway between the windshields to see the bridge.

3. When the interior lights on the boat were turned on I lost much of my night vision capability, night adaptivity. The bridge became very difficult to detect; was not detectable until in very close proximity.

4. With the compass light off and the interior lights off I could distinguish the bridge at a distance over one hundred feet.

5. When the tower lights were activated the brightness of the light totally destroyed the night adaptation capabilities of the operator of the boat and all the parties in the boat. The lights created extremely high level of illuminance that reduced the operator's ability to have vision to see objects in the immediate vicinity. The potential collision issues were greatly increased. The boat should not be operated with the tower lights on.

Swint's affidavit contains the following findings:

1. The Regal boat and its component parts were defective as designed.

2. The Regal boat and its component parts were unreasonably dangerous.

3. The defects in the Regal boat and its component parts were a producing cause of the collision.

4. Regal Marine, Taylor Made Group, Rule Industries and CIPA were negligent in their design and marketing of the boat and/or its component parts.

5. The negligence of Regal Marine, Taylor Made Group, Rule Industries and CIPA were a proximate cause of the collision, injuries and damages sustained by Dr. Henegar, Lori Henegar, Drue Henegar and Mason Henegar.

Andre offered his opinions on the proximate and producing causes of the collision. Andre references two photographs to illustrate his point: the first photograph shows the interior of the boat at night with the cockpit and speaker lights illuminated and the second photograph shows the boat's windshield from directly behind the operator's right shoulder as he made a night approach to the bridge. The first photograph shows an ambient blue hue cast over the interior of the boat. The second photo shows "blue and red glare from the cockpit lights, speaker lights and the compass is reflected in the windshield." Andre opines that

> [f]rom a visual science perspective, the boat lighting/compass/windshield configuration presents a number of problems for the operator, namely, (1) increased adaptation level, (2) veiling glare, (3) central visual field interference, and (4) accommodative interference. All of these would have impaired the boat operator's ability to correctly detect and identify the bridge's condition.

Andre goes on to discuss the visual science behind his conclusions. He describes how human eyes must adapt to ambient lighting conditions in our immediate surroundings. Andre explained that when human eyes are adapted to brighter levels of light, the ability to detect details of objects in darker areas is compromised. Andre stated that the boat's speaker and cockpit lights increased the ambient illumination in the boat from 0.0 lux to 3.57 lux.[3] He opined that this level of lux would raise the adaptation level of the operator's eyes, making it more difficult to detect the properly identified low luminance objects such as the bridge and its pylons.

Andre describes veiling glare as caused by unwanted stray light from a source. Veiling glare decreases the stimulus contrast while increasing luminance and results in an impairment in visual performance, specifically the ability to see dimmer, low contrast objects. Andre opines that the cockpit, speaker and compass lighting created veiling glare that must have been looked through to detect the bridge and its pylons.

Andre further explained that the reflection of the compass in the windshield is in the central visual field for an optimally positioned boat operator. He explained that the human visual field extends approximately 180 degrees horizontally and 140 degrees vertically, but it is the central visual field surrounding the point of fixation that receives the most visual processing. The central visual field falls on the fovea of the eye's retina. The fovea processes an

---

[3] According to Swint's report, ambient lighting in our environment is usually quantified by illumination measurements. Illuminance is the amount of light which falls onto a surface. Illuminance is commonly quantified by "lux." For reference, there are approximately six hundred to eight hundred lux in a typically lit office environment, and well over 50,000 lux outside on a bright and sunny day.

approximately five degree circular part of the central visual field, where the visual processes such as acuity, color perception, motion perception, and depth perception are best. Andre opined that the reflection of the compass in the central visual field of the operator would "interfere with the foveal processes that would be needed to detect and properly identify the bridge's condition."

Andre believed the compass caused accommodative interference. Andre stated that, to see clearly, objects must be properly focused onto the retina. Accommodation refers to the eye's focusing mechanism, i.e., how the lens of the eye changes shape to create a clear image on the retina allowing the observer to see the fine details of the object. The eye's accommodation system has a resting state which is defined as the distance to which the eyes focus in total darkness. It is from this location that all accommodative effort begins. If the eye has a choice of visual images at different distances, it will choose the one closest to the resting state distance since that location requires little or no effort to maintain. Thus, images at the resting state distance can interfere with optimal accommodative performance for seeing distant objects. Accordingly, Andre opined that the reflection of the compass in the windshield "would interfere with seeing distant objects tens or hundreds of yards away such as the bridge and its pylons." Andre concluded that:

> It is my understanding that Texas law defines "proximate cause" as a cause that was a substantial factor that bring about an event. [sic] By this definition, these four problems created by the lighting/compass/windshield configuration would have impaired the operator's ability to correctly detect and properly identify the bridge's condition and are thus proximate causes of the collision.

In her affidavit, Lux opines that "Scala's ability to adequately see the bridge where the collision occurred was impaired because of ambient light that prevented him from fully adapting to night vision." Lux also stated that Scala's vision was likely obscured by reflections in the windshield frame, the marine rear view mirror, and the passengers in the front (bow) seating area of the boat. According to Lux, "[h]ad...Scala's night vision been fully adapted and his forward view not obscured, it is likely he would have seen the bridge and understood the potential hazard in time to turn and avoid the collision." However, with respect to nighttime adaptation vision, Lux stated that "the 360 degree white light on the arch and the interior lights, including the compass and cockpit lights would provide enough light to prevent people in the cockpit from completely adapting to low light conditions in the cockpit and would make it difficult for them to

6

clearly see surroundings outside of the boat." Lux stated that the reflections of the compass and dashboard gauges could be reflected through the windshield at night, impairing the operator's ability to see clearly through the windshield.

CAUSATION

As part of their first, second, third, fourth, fifth, sixth, and seventh issues, the Henegars argue that the trial court erred in granting traditional and/ or no evidence summary judgment on their claims against Dill, Regal, Rule, and Earmark on grounds that (1) it is conclusively established that the boat's compass and lighting features were not the proximate or producing cause of the collision, and/or (2) the Henegars produced no evidence that the boat's compass and lighting features were a proximate or producing cause of the collision. Dill moved for traditional summary judgment, Regal and Earmark moved for traditional and no evidence summary judgment, and Rule moved for no evidence summary judgment.

**Standard of Review and Applicable Law**

We review the trial court's decision to grant a traditional motion for summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). To be entitled to a traditional summary judgment, a defendant must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Priddy v. Rawson*, 282 S.W.3d 588, 592 (Tex. App.— Houston [14th Dist.] 2009, pet. denied). Once the party moving for summary judgment establishes its right to summary judgment as a matter of law, the nonmovant must present evidence raising a genuine issue of material fact to avoid the motion being granted. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678-79 (Tex. 1979). We review the evidence in the light most favorable to the nonmovant, accept all of the nonmovant's factual assertions as true, and resolve any doubt in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–549 (Tex. 1985).

A no-evidence summary judgment motion under Rule 166a(i) is essentially a motion for a pretrial directed verdict; it requires the nonmoving party to present evidence raising a genuine issue of material fact supporting each element contested in the motion. TEX. R. CIV. P. 166a(i); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006). When reviewing a no-evidence summary judgment, we "review the evidence presented by the motion and

7

response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mack Trucks,* 206 S.W.3d at 582 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 208 (Tex. 2002)).

When determining if more than a scintilla of evidence has been produced in response to a Rule 166a(i) motion for summary judgment, the evidence must be viewed in the light most favorable to the non-movant. *Johnson,* 73 S.W.3d at 208. We have repeatedly held that more than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). On the other hand, "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

Both direct and circumstantial evidence may be used to establish any material fact. *See Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex. 2001); *see also Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). To raise a genuine issue of material fact, however, the evidence must transcend mere suspicion. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). Evidence that is so slight as to make any inference a guess is in legal effect no evidence. *Lozano,* 52 S.W.3d at 148; *Browning–Ferris, Inc.*, 865 S.W.2d at 928. When a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993).

Negligence requires a showing of proximate cause, while producing cause is the test in strict liability. *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex. 1995), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007). Proximate and producing cause differ in that foreseeability is an element of proximate cause, but not of producing cause. *Id*. Proximate cause consists of both cause in fact and foreseeability. *Id.* Cause in fact means that the defendant's acts or omission were a substantial factor in bringing about the injury which would not have otherwise occurred. *Id.* Producing cause is one that is a

substantial factor that brings about the injury and without which the injury would not have occurred. ***Ledesma***, 242 S.W.3d at 46. Thus, the two essential elements of producing cause are (1) the cause must be a substantial cause of the event in issue, and (2) it must be but-for cause, namely one without which the event would not have occurred. ***Id.***

**The Motions**

Dill moved for traditional summary judgment on grounds that "[Dill] was [not] the [l]egal cause or the [c]ause in [f]act of the [a]ccident." Dill notes that cause in fact is common to both proximate and producing cause and includes the requirement that its conduct or product be a substantial factor in bringing about the harm. As part of its summary judgment evidence, Dill offered testimony from Anthony, Larry, Sierra, and Mason. Dill offered the following testimony from Anthony:

1. He had no independent recollection of the night of the collision.
2. He never had any issues with visibility through the windshield during the four plus years he owned and operated the boat prior to the collision.
3. He said the compass and dashboard lights were dull and never impaired his vision while operating his boat at night in the past.
4. He never complained to anyone, prior to the accident, about defects in the windshield, lights, and speakers.
5. If he drove the boat at night with the compass light on, he did not notice the light or remember it.
6. The lights on the tower speaker impaired his vision but he usually kept them off when operating the boat at night so that he could see better and not disturb the neighbors.
7. It was his usual practice to leave the interior cockpit lights and speaker lights off when operating the boat at night.

Dill also offered the following testimony from Larry:

1. He did not see the underwater lights switch turned on the evening of the collision, nor did he turn the switch on or off or see anyone else turn the switch on or off.
2. He did not know whether the underwater lights were activated the night of the collision.
3. He did not think he saw the compass or the compass light on the night of the collision.
4. He did not recall seeing the compass but that might have been the reason he put his head out to the left when operating the boat.
5. He recalled the evening as "black as could be."
6. The bridge was easily visible but he was unable to identify that the bridge had such a low clearance.
7. He believed he hit the bridge because it was not properly lit and this was "the major problem."
8. He did not tell Texas Parks & Wildlife that a glare from the lights on the boat affected his vision.
9. No one complained that the boaters seated in the bow blocked their vision the night of the collision.
10. He thought the standard running lights were the only lights on in the boat.
11. He did not recall what lights were on in the boat.
12. He did not believe people sitting in the bow of the boat caused the collision.

13. He saw the bridge prior to the collision, but does not recall how far away the boat was from the bridge or how much time passed between when he saw the bridge and the collision.
14. He had no problem with occupants in the bow obstructing his vision, and if he had, he would have told them to move.

Dill further relied on the following testimony from Sierra:

1. While Mason was driving the boat, she never complained that her forward visibility was obstructed by Dan sitting in the bow.
2. Sierra never complained to Larry that the glare prevented her from seeing out the windshield while driving the boat.
3. While Sierra was driving the boat, she never asked anyone to move out of the bow because she could not see.
4. She did not recall anyone complaining about visibility, i.e., not being able to see, the night of the collision.
5. There was a period of time that night, prior to the collision, where no one was attending the helm of the boat.

Additionally, Dill offered the following testimony from Mason:

1. She did not recall noticing anything on the dash, including a compass or lights.
2. She did not recall whether the boat had a tower arch.
3. While driving the boat the night of the collision, she did not complain of being unable to see.
4. She never asked Dan to move from the bow because he blocked her vision while she was driving the boat.
5. She did not recall ever experiencing any issues with visibility through the windshield or problems with visibility due to the windshield components in the four plus years her family owned the boat.
6. She never experienced anything that gave her reason to believe that the windshield or windshield components were defective, nor did she ever have any problems with visibility through the windshield.
7. She did not recall any component of the windshield obstructing her view.

Dill argued that the undisputed testimony from the people on the boat proves that no act or omission alleged against Dill was the legal cause of the accident. Dill also argued that the allegations against Dill are frivolous and "without a doubt, not the cause in fact of this accident."

Rule moved for no evidence summary judgment on causation, similarly pointing out that "no witness to the accident has testified that there was any glare on the windshield, that the compass light was even on to create such a glare, or that any glare caused the accident." Earmark moved for traditional and no evidence summary judgment on causation arguing that no witness testified that the speaker lights were illuminated at the time of the collision. Regal

moved for traditional and no evidence summary judgment on causation and pointed to the boaters' testimony in support of its motion.

## Analysis

Producing or proximate cause is an element of all of the Henegars' claims against Dill, Regal, Rule, and Earmark, which include negligence, design, manufacturing, and marketing defects, fraud, and violations of the DTPA. *See Mack Trucks,* 206 S.W.3d at 582. Causation in fact is common to both proximate and producing cause, including the requirement that the defendant's conduct or product be a substantial factor in bringing about the injuries in question. *Id.*

The Henegars argue that Dill's motion for summary judgment was confined to disputing legal cause because its motion argued that the boat's defects and Dill's conduct were "too attenuated." The Henegars argue that Dill's motion only preserved an attack on legal cause and thus, it is the only ground which we can consider. We disagree. Dill moved for traditional summary judgment on grounds that its acts or omissions and its products were not the legal cause or cause in fact of the accident. In so doing, it relied on the boaters' testimony to establish its theory that the Henegars' claims are "frivolous and, were, without a doubt, not the cause in fact of the accident." Dill clearly argues in its motion that no act, omission, or product defect was the cause in fact of this accident.

To be entitled to traditional summary judgment, Dill, Regal, and Earmark were required to conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Priddy*, 282 S.W.3d at 592. The Henegars argue that the evidence did not conclusively negate causation. We disagree. The Henegars' theory of causation is that the combination of lights from the cockpit, compass, speaker, and tower negatively impacted Larry's night vision, and that the compass, bow occupants, and windshield obstructed Larry's forward vision. Their experts opine that *all* these circumstances were a proximate and producing cause of Larry's failure to appreciate the bridge's low clearance, and thus a proximate and producing cause of the collision.

We conclude that each Appellee met its burden to establish that there is no issue of material fact and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166(c). All negated the Henegars' theory of causation by presenting Anthony's testimony that it was not his practice to operate the boat at night with the tower and cockpit lights on, and Scala's testimony

11

that he failed to appreciate the low clearance height of the bridge because it was dark and the bridge was unlit, not because of any visual obstructions within the boat. Once the party moving for summary judgment establishes its right to summary judgment as a matter of law, the nonmovant must present evidence raising a genuine issue of material fact to avoid the motion being granted. *See **Clear Creek Basin Auth.**,* 589 S.W.2d at 678-79.

The Henegars argue that:

> Although the boaters have at points testified that they didn't recall it, the full complement of lights—cockpit, navigation, tower-speaker, and compass lights—were in fact on, as shown by physical proof—including photos showing the light switches in the activated positions—and testimony that the activated courtesy/cockpit light switch operated both the cockpit and tower lights while the activated navigation-light switch operated the navigation and compass lights. This must be taken as true.

(citations omitted). Four of the photographs referenced by the Henegars, taken post collision, show the boat with the cockpit light switch and navigation light switch activated, and the cockpit lights illuminated. These photographs were shown to Scala at his deposition and are attached as exhibits to Scala's deposition in an appendix to a response the Henegars filed with the trial court. As Dill points out in its briefing, the photographs are cited without context to when they were taken or who took them. The Henegars assert that a game warden with Texas Parks and Wildlife took the photographs. They state that the "game warden proved them authentic, having been taken shortly after the accident, and to accurately represent the boat's untampered interior." A fifth photograph shows the boat, after the collision, with one of the cockpit lights illuminated. This fifth photograph is attached to an affidavit from Officer Brock with the Caney City Police Department.[4] Brock states in his affidavit that he arrived on the scene of the collision at 10 p.m. and took pictures of the boat. He stated that the picture attached is one he took at around 10:15 p.m. He further stated that from the time he arrived at the boat until he took the pictures, no one touched or adjusted the switches on the boat. The Henegars cite to Brock's affidavit for their contention that "the photos are probative...the game warden proved them authentic, having been taken shortly after the accident..."

Our review of the record reveals that Brock's affidavit is applicable only to the fifth photograph attached to his affidavit, which shows the cockpit lights on when he arrived on scene.

---

[4] Brock's affidavit does not list his first name. The affidavit is titled "Affidavit of Officer Brock" and is signed by "Officer Brock."

It is unclear how long after the collision he took the photograph; his affidavit states it was around 10:15 p.m., but this cannot be correct as the parties agree the accident did not occur until approximately 11:30 p.m. The Henegars assert that the game warden took the four photographs "shortly after the accident" but there is no evidence in the record to support this suggestion. There is no affidavit or similar description with respect to the four photographs attached to Scala's deposition. There is, however, a statement in Larry's deposition by the attorney representing the Henegars that the photographs given to them by Texas Parks and Wildlife were taken the day after the collision.

Regardless of which agency took the photographs or whether they were taken the night of the collision or the next day, we must still conclude that the photographs are only probative of the fact that the cockpit light switch was activated and the cockpit lights were on at the time the photographs were taken. The photographs are not direct evidence that the lights were on at the time of the accident. However, the photographs are some meager circumstantial evidence that the cockpit switch was activated and the cockpit and tower lights were on at the time of the collision. *City of Keller*, 168 S.W.3d at 813. In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla if jurors would have to guess whether a vital fact exists. *Id.* When the circumstances are equally consistent with either of two facts, neither fact may be inferred. *Id.* In such cases, we must view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances. *Id*. Thus, when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable evidence but all the circumstantial evidence, and competing inferences as well. *Id.*

As previously stated, one of the photographs shows the cockpit lights illuminated when Brock arrived on the scene sometime after the collision. The other photographs show that the cockpit light switch was activated sometime after the accident, possibly the next day. Because the photographs are but mere circumstantial evidence that the lights were on at the time of the collision, we do not consider the photographs in isolation, but in light of all the known circumstances. *Id.* No witness was able to recall which lights were on at the time of the collision. Larry testified that the conditions at the time of the collision were very dark and he did not attribute his failure to appreciate the low clearance to any of the boat's lights. Anthony testified that he did not turn the cockpit or the tower speaker lights on at night because they

affected his vision and disturbed the neighbors. No one on the boat on the night of the collision testified to which lights were on at the time of the collision. Thus, considering all the known circumstances, it is this Court's holding that an equally or even more likely inference is that the boaters activated the cockpit light switch after the collision to provide light to assess Dan's and Anthony's severe injuries, locate first aid supplies or cell phones to call for help, or for any myriad of reasons. *Id.* Simply put, the boaters turning on the cockpit lights right after suddenly hitting a bridge at night is at least an equally plausible if not more likely inference as opposed to all of the lights being on at the time of the collision.

When the circumstances are equally consistent with either of two facts, neither fact may be inferred, and the evidence does not rise above a scintilla if a factfinder would have to guess about the vital fact. *Id.* Thus, we cannot, as the Henegars urge us, take as true that *all* of the boat's lights were on at the time of the collision. *Id.* The only direct evidence in the record that establishes that any of the boat's lights were on is Swint's documented finding of hot shock on the navigation light filaments, indicating that the navigation and compass lights were on at the time of the accident. However, none of the Henegars' experts opined that the compass light, in isolation, or in conjunction with the other frontal visual obstructions, were the proximate or producing cause of this accident. The experts' opinions were that *all* of the identified hazards, taken together, were the proximate or producing cause of this accident. Thus, because the Henegars failed to produce more than a scintilla of evidence that the cockpit and speaker lights were on at the time of the collision, they failed to meet their burden to demonstrate that a genuine issue of material fact exists. *See **Clear Creek Basin Auth.***, 589 S.W.2d at 678-79. We conclude that the trial court correctly granted summary judgment in favor of each Appellee on all of the Henegars' primary claims.

Furthermore, because Lori, Mason, and Drue's consortium claims are derivative of Anthony's claims, i.e., Lori, Mason, and Drue must demonstrate there is a liable tortfeasor for Anthony's personal injury damages, we hold the trial court correctly dismissed those claims as well. *See **Reed Tool Co. v. Copelin***, 610 S.W.2d 736, 738-9 (Tex. 1980). Similarly, Mason's bystander claim was correctly dismissed because a bystander may recover only if she can establish "the defendant has negligently inflicted serious or fatal injuries on the primary victim." ***Boyles v. Kerr***, 855 S.W.2d 593, 598 (Tex. 1993). Moreover, the Henegars' claims for gross negligence against Dill and Regal were correctly dismissed because the Henegars failed to

establish the causation element of their negligence claims against Dill and Regal. *See **Trevino v. Lightning Laydown, Inc.**,* 782 S.W.2d 946, 949 (Tex. App.—Austin 1990, writ denied).

Thus, because we conclude that no genuine issue of material fact exists with respect to the causation element of the Henegars' claims, we overrule the Henegars' first, second, third, fourth, fifth, sixth, and seventh issues. Because, this issue is dispositive of the appeal, we need not reach their eighth issue.[5]

## CONCLUSION

Having overruled the Henegars' first, second, third, fourth, fifth, sixth, and seventh issues, we ***affirm*** the trial court's judgment.

GREG NEELEY
Justice

Opinion delivered January 5, 2022.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

---

[5] In their eighth issue, the Henegars argue that the statute of limitations is not a ground that supports summary judgment. Having already concluded that Dill, Regal, Rule, and Earmark are entitled to traditional or no evidence summary judgment on causation grounds, we do not reach this issue. *See* TEX. R. APP. P. 47.1.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JANUARY 5, 2022**

**NO. 12-20-00139-CV**

**ANTHONY HENEGAR AND LORI HENEGAR, INDIVIDUALLY AND A/N/F MASON HENEGAR, DRUE HENEGAR AND MASON HENEGAR,**
Appellants
V.
**REGAL MARINE INDUSTRIES, INC., ET AL,**
Appellees

---

Appeal from the 173rd District Court
of Henderson County, Texas (Tr.Ct.No. CV17-0294-392)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, all costs of this appeal are assessed against the Appellants, **ANTHONY HENEGAR AND LORI HENEGAR, INDIVIDUALLY AND A/N/F MASON HENEGAR, DRUE HENEGAR AND MASON HENEGAR**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*