

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-07-00122-CV

_____


CHARLES T. MERRELL, SR., AS WRONGFUL DEATH
BENEFICIARY OF CHARLES THOMAS MERRELL, II,
DECEASED AND AS REPRESENTATIVE OF THE ESTATE
OF CHARLES THOMAS MERRELL, II, DECEASED, AND
JANE CERVERNY, AS WRONGFUL DEATH BENEFICIARY
OF CHARLES THOMAS MERRELL, II, DECEASED, Appellants

V.

WAL-MART STORES, INC., Appellee


On Appeal from the 336th Judicial District Court
Fannin County, Texas
Trial Court No. 38243


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

Charles T. Merrell, Sr., and Jane Cerverny[1] (collectively the Parents) bring this appeal of the trial court's order granting Wal-Mart, Inc., summary judgment.[2] This is a products liability suit based on an allegedly defective halogen torchiere lamp which may have caused the wrongful death of Charles Thomas Merrell, II (Charles II), Merrell and Cerverny's son. Charles II had just graduated from Austin College and had been hired as a stockbroker for A.G. Edwards' Paris, Texas, office. The house Charles II rented caught fire and burned, killing Charles II and his girlfriend, Latosha Gibson. The fire originated near the recliner in the living room. The fire report indicated the cause of the fire was unknown. The halogen torchiere lamp, which the Parents allege was the cause of the fire, was located next to the recliner. Wal-Mart denied the lamp was the cause of the fire. An alternative cause of the fire, which Wal-Mart alleges was more likely the cause, was that a dropped marihuana joint or cigarette caused the fire. Both victims had marihuana in their systems at the time of their

--------

[1]Merrell brought suit in his capacity as a wrongful death beneficiary of Charles Thomas Merrell, II, deceased, and as representative of the Estate of Charles Thomas Merrell, II, deceased. Jane Cerverny brought suit in her capacity as wrongful death beneficiary of Charles Thomas Merrell, II, deceased.

[2]The Parents also brought suit against the Holmes Group, a manufacturer of halogen torchiere lamps, and Wilma Pearce, the landlord. The Parents alleged that Pearce failed to equip the residence with a smoke detector. In addition, Wal-Mart brought a cross-claim for indemnity and contribution against Pearce for failing to install a smoke detector. The Parents' claims against Wal-Mart were severed from the rest of the case after the trial court granted Wal-Mart's motion for summary judgment.

deaths. The trial court granted Wal-Mart's no-evidence and traditional motions for summary judgment.

The Parents complain on appeal that the trial court erred in granting Wal-Mart's summary judgment motion. Wal-Mart raises a counter-issue alleging the trial court erred in admitting some of the summary judgment evidence. We conclude the trial court did not abuse its discretion in admitting the summary judgment evidence. The trial court, though, did err in granting Wal-Mart's motion for summary judgment. The Parents presented more than a scintilla of evidence concerning each element challenged by Wal-Mart, and Wal-Mart did not establish it was entitled to judgment as a matter of law. We reverse the judgment of the trial court.

**Facts**

When Charles II graduated with honors from Austin College, he accepted a position as a stockbroker with A.G. Edwards in Paris, Texas. Charles II and Gibson rented a home in Honey Grove, Texas, near Paris, Texas. In October 2000, Charles II began a nine-week course to prepare for the stockbroker's examination and asked Merrell to "go and buy a floor lamp so he could study because the lighting was so bad in that house." The two went together to purchase the lamp at Wal-Mart. Although Merrell could not remember the specific Wal-Mart store at which the lamp was purchased, Merrell testified he was positive the lamp was purchased at a Wal-Mart store because he "never shopped anywhere but Wal-Mart." Charles II selected a lamp which may have been a halogen

3

torchiere lamp.[3]  Merrell paid around $30.00 for the lamp.  Because the lamp was a floor model, Merrell did not receive a box, any of the accompanying warnings, or instructions for safe operation. Even though the United States Consumer Product Safety Commission (the Commission) required all retailers to make available a free wire mesh guard for all halogen torchiere lamps, Wal-Mart did not provide a wire mesh guard with the lamp.  Merrell testified there was a warning sticker on the cord, but could not remember what the sticker said.  Charles II took the lamp home and placed it by his recliner in the living room.

During the early morning hours of December 2, 2000, a fire started in the living room while Charles II and Gibson were sleeping.  The fire engulfed the entire house.  Neither Charles II nor Gibson were able to escape, and both died of smoke inhalation.  The toxicology report detected cannabinoids in the blood of both victims at the time of their deaths.  It is uncontested that the fire originated in the general vicinity of the recliner.  The recliner was completely consumed in the fire and was more extensively consumed by the fire than any other piece of furniture.  The fire burned through the ceiling approximately two feet from the recliner.

The fire inspectors concluded the "exact cause of the fire could not be determined." Although photographs of the fire were preserved, the lamp was inadvertently disposed of and has

---

[3]Merrell testified the lamp was a dark color.  He believed the lamp was black, but it could have been dark blue or dark green.

4

not been recovered.[4] In the fire report, the fire inspectors noted that the victims were known to leave candles unattended. Mickey Holmes, the chief of police for Honey Grove, testified there were candleholders located on a small table between the lamp and the sofa.[5] The lamp had been warped from the heat, but was upright and plugged in. Holmes estimated the height of the lamp would be approximately six feet. Holmes testified that a bong[6] and ashtrays were found in the house.[7] One of the ashtrays was on the small table with the candleholders. Larry Phillips, a lieutenant with the Honey Grove Police Department, testified they found "quite a bit" of drug paraphernalia. The police found a bong, several pipes, and several joints located in ashtrays. Phillips could not recall if any of the pipes were found in the living room. Phillips testified the joints and blunts were found in ashtrays. Although several of the ashtrays were collected and preserved as evidence, the ashtray

[4]After the fire, the burned lamp was disposed of. After searching a number of dumpsters, Merrell offered a reward for the lamp. Joe Williams, who had been hired to cover the windows of the house with plywood, and Royce "Stoney" Mackey presented Merrell with a destroyed lamp and collected the reward. John Lentini, Wal-Mart's expert, discovered traces of gasoline on the lamp. In addition, the lamp presented by Williams only contained two tubular vertical pieces while the photograph at the scene showed the lamp contained three pieces. In his deposition, Williams admitted they burned another lamp and misrepresented that it was from the fire. Williams admitted to having a criminal record. Wal-Mart emphasizes this fraud, but there is no evidence Merrell participated in the deception.

[5]The officers collected the candleholders and other evidence, but a number of the items collected are now missing, including the candleholders. The videotape taken at the scene and some of the photographs are also missing.

[6]A smoking device.

[7]Although there is no evidence Charles II smoked cigarettes, there is some evidence that Gibson smoked cigarettes.

located in the living room was not preserved. Phillips remembered a pole lamp with a bowl on top, but could not recall whether it was a halogen or incandescent lamp.

Clinton D. Williams, the fire marshall, conducted his investigation approximately four days after the fire. Although he did not find any candleholders during his investigation of the fire, Williams testified he had been advised "the subjects that lived in the house did burn candles." Williams testified the table "was charred heaviest on the side that would have been up against the chair." Williams opined the candles were not a likely cause of the fire based on the charring of the table. When asked whether bulb fragments from an exploding halogen lamp could have caused a smoldering fire in the recliner, the fire marshall stated, "Could be a possibility. I haven't seen anything that would discount or prove either way." The fire marshall testified a dropped cigarette butt, joint, or ashes could have caused a smoldering fire, and he could not rule out smoking materials as a potential cause of the fire. In the fire marshall's opinion, the chair likely smoldered for a couple of hours before it ignited into flames. The fire marshall based this opinion on "the patterns, the Sheetrock, and the wood and the charring" as well as the burn-through in the ceiling above the reclining chair. The lamp had been disassembled by the time the fire marshall conducted his investigation. The pieces of the lamp were leaning against the wall. The fire marshall did not investigate whether the lamp was a halogen lamp or what the wattage of the bulb was. The fire marshall could not recall whether he examined the bowl of the lamp.

Wal-Mart retained two fire experts: Richard Dyer, the Fire Chief for Kansas City, Missouri, and Lentini. The Parents originally hired David Dallas as an expert. Shortly before summary judgment, the Parents retained Dr. Craig Beyler as an expert and removed Dallas' name as a testifying expert. Both sides agree Dallas' testimony is no longer admissible, since Dallas had been delisted, and should not be considered by this Court. Because both sides stipulate Dallas' deposition testimony is inadmissible, we will assume the deposition testimony is inadmissible for the purpose of this appeal.[8] About the only thing the experts could agree on was that the fire investigation was not very thorough.

**Discussion**

The Parents brought suit for negligence, gross negligence, breach of warranty, and strict products liability. The Parents' claims for negligence, gross negligence, and breach of warranty involve the same underlying conduct as the strict products liability claim. At trial and on appeal, Wal-Mart did not challenge any elements unique to negligence, gross negligence, or breach of warranty. Here, the only alleged negligence was the selling of a defective product. In that instance, the plaintiff must prove that the injury resulted from a defect in the product. *Toshiba Int'l Corp. v. Henry*, 152 S.W.3d 774, 784–85 (Tex. App.—Texarkana 2004, no pet.) (citing *Simms v. Sw. Tex. Methodist Hosp.*, 535 S.W.2d 192, 197 (Tex. Civ. App.—San Antonio 1976, writ ref'd n.r.e.). In its order granting Wal-Mart's motion, the trial court stated "all claims and causes of action asserted by

---

[8]This conclusion has not been briefed, and we do not express an opinion as to whether the conclusion reached by both sides is correct.

7

Plaintiffs against Wal-Mart shall be DISMISSED with prejudice." Because all of the Parents' causes of action are based on a product defect and the parties have only briefed strict products liability, this opinion will focus exclusively on strict products liability.

The Texas Supreme Court has adopted the Second Restatement's standard for products liability. *See Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681 (Tex. 2004); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 335 (Tex. 1998). The Second Restatement provides:

> (1)    One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> (a)    the seller is engaged in the business of selling such a product, and
> (b)    it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A (1965). The four elements for a products liability action are:

> (a) the product must be defective; (b) the product must reach the consumer without substantial change from the time it leaves the possession and control of the manufacturer or seller; (c) the defective condition of the product must render the product unreasonably dangerous; and (d) the unreasonably dangerous condition of the product must be the cause of the injury to the user.

*Toshiba*, 152 S.W.3d at 778.

Strict products liability requires proof of producing cause. Producing cause is a cause that is a substantial factor in bringing about an injury and without which the injury would not have occurred. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45 (Tex. 2007) (rejecting definition that

producing cause is "an efficient, exciting, or contributing cause that, in a natural sequence, produces the incident in question"). In other words, the essential components of producing cause are "(1) the cause must be a substantial cause of the event in issue and (2) it must be a but-for cause, namely one without which the event would not have occurred." *Id.*

## I. The Parents' Summary Judgment Evidence Was Admissible

Before we turn to the merits of this appeal, we are faced with the question of whether the trial court erred in admitting all of the summary judgment evidence. The admission or exclusion of summary judgment evidence rests with the sound discretion of the trial court. *New Braunfels Factory Outlet Ctr., Inc. v. IHOP Realty Corp.*, 872 S.W.2d 303, 310 (Tex. App.—Austin 1994, no writ). Wal-Mart argues the trial court abused its discretion in overruling Wal-Mart's objections to some of the summary judgment evidence.

### A. The Trial Court Erred in Admitting Jay Whitlock's Unsworn Affidavit for All Purposes

Wal-Mart argues the trial court erred in admitting the affidavit of Whitlock. In this affidavit, Whitlock, who was Charles II's neighbor, stated he noticed the living room lamp was still on when he left his house "late Friday night to go play cards," i.e., the night of the fire. The affidavit, though, is not sworn. Because the affidavit is not sworn, Wal-Mart argues the affidavit is incompetent evidence. By statute, an affidavit must be "signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office." *See* TEX. GOV'T CODE ANN. § 312.011(1) (Vernon 2005). An unsworn affidavit is incompetent summary

9

judgment evidence. *See Clendennen v. Williams*, 896 S.W.2d 257, 260 (Tex. App.—Texarkana 1995, no writ); *see also Residential Dynamics, LLC v. Loveless*, 186 S.W.3d 192, 196 (Tex. App.—Fort Worth 2006, no pet.); *Bernsen v. Live Oak Ins. Agency, Inc.*, 52 S.W.3d 306, 310 (Tex. App.—Corpus Christi 2001, no pet.). The trial court erred in admitting Whitlock's affidavit for all purposes.[9] However, as discussed below, Whitlock's affidavit was admissible for a limited purpose as information reasonably relied upon by Dr. Beyler.

**B.      Dr. Beyler's Affidavit Was Admissible Summary Judgment Evidence**

Wal-Mart advances two reasons for excluding Dr. Beyler's affidavit. First, Wal-Mart argues the affidavit should have been excluded because it relies on inadmissible evidence, i.e., Whitlock's affidavit. Second, Wal-Mart argues Dr. Beyler's testimony should not have been admitted because it was scientifically unreliable. Wal-Mart does not challenge Dr. Beyler's qualifications as an expert witness.[10]

---

[9]To obtain a reversal of the judgment, appellant must first show that the trial court did in fact commit error, and second that the error was reasonably calculated to cause and probably did cause the rendition of an improper verdict. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). There is no reversible error if the evidence in question is cumulative or is not controlling on a material issue dispositive of the case. *Id.*; *Sanders v. Shelton*, 970 S.W.2d 721, 727 (Tex. App.—Austin 1998, pet. denied). This error would not be reversible.

[10]Summary judgment evidence must establish the witness' qualifications as an expert. *Hall v. Huff*, 957 S.W.2d 90, 99–102 (Tex. App.—Texarkana 1997, pet. denied). The summary judgment evidence indicates Dr. Beyler is qualified as an expert. Dr. Beyler has bachelor's degrees in civil engineering and fire protection engineering, master's degrees in mechanical engineering and fire safety engineering, and a Ph.D. in engineering science. In addition, Dr. Beyler lists approximately three pages of published articles and has over twenty-five years of experience in the field.

**1.    Dr. Beyler's Affidavit Is Not Invalid Because It Relied on Hearsay**

Wal-Mart argues Dr. Beyler's affidavit is inadmissible because it relies upon the unsworn affidavit of Whitlock.  The Parents argue Dr. Beyler could reasonably rely on the statement under Rule 703 of the Texas Rules of Evidence.

The Texas Rules of Evidence were adopted over twenty years ago to permit experts to consider inadmissible evidence.  Traditionally, an expert could not rely upon statements of third parties that were not properly admitted into evidence.  *See Moore v. Grantham*, 599 S.W.2d 287, 289 (Tex. 1980).  Although *Moore* has not been overruled, both this Court and the Texas Supreme Court have noted it was effectively overruled by the adoption of the Texas Civil Rules of Evidence (now the Texas Rules of Evidence).  *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 562–63 (Tex. 1995); *Stam v. Mack*, 984 S.W.2d 747, 750 (Tex. App.—Texarkana 1999, no pet.); *Baylor Med. Plaza Servs. Corp. v. Kidd*, 834 S.W.2d 69, 76 (Tex. App.—Texarkana 1992, writ denied).

Rule 703 expressly permits an expert to base his or her opinion upon facts or data "perceived by, reviewed by, or made known to the expert at or before the hearing."  TEX. R. EVID. 703; *see In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434, 440 (Tex. 2007) (orig. proceeding); *Kidd*, 834 S.W.2d at 76.  "If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."  TEX. R. EVID. 703.  "This change was designed to broaden the basis for expert opinions and to bring

11

courtroom practice in line with the practice of experts themselves when they are not in court." *Robinson*, 923 S.W.2d at 563.

Wal-Mart cites 1 MCCORMICK ON EVIDENCE § 15 (6th ed. 2006) (Westlaw through 2008), for the proposition that an expert should not have reasonably relied upon Whitlock's statement. We disagree that the treatise provides support for Wal-Mart's argument. This is not an "extreme case" where a judge should "have a residual power to second guess the customary practice" and declare a source untrustworthy. *See id*. The hypotheticals in MCCORMICK ON EVIDENCE are clearly distinguishable from this case. Whitlock is not an unknown bystander, nor does the statement repeat a rumor. *See id*. at n.10. The veracity of Whitlock's statement can be verified, and Wal-Mart could present contrary evidence if the statement is incorrect. An expert is not required to have personal knowledge of the facts upon which he or she bases his or her opinion and can reasonably rely upon the factual statements of eyewitnesses. *See Sosa v. Koshy*, 961 S.W.2d 420, 427 (Tex. App.—Houston [1st Dist.] 1997, pet. denied) (expert could rely on statements by eyewitness). Wal-Mart's experts also rely on witness statements which were not introduced into the record in admissible form (or even introduced at all). Because the trial court could reasonably conclude Whitlock's statement was of the nature reasonably relied upon by experts, the trial court did not abuse its discretion in admitting Dr. Beyler's affidavit.

## 2.     Dr. Beyler's Affidavit Is Not Incompetent Evidence

Wal-Mart claims Dr. Beyler's affidavit is speculative, conclusory, and scientifically unreliable. We note that Wal-Mart failed to make a *Robinson* challenge[11] to Dr. Beyler in the trial court.[12] The Texas Supreme Court has held that an objection is required "when a challenge to expert testimony questions the underlying methodology, technique, or foundational data used by the witness." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 229 (Tex. 2004); *see Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998) (to "preserve a complaint that

[11]The trial court must make a threshold determination of the admissibility of expert testimony under Rule 702. TEX. R. EVID. 702; *Robinson*, 923 S.W.2d at 556. To be reliable, the scientific techniques or principles underlying the expert's testimony must be well grounded in the methods and procedures of science. *Robinson*, 923 S.W.2d at 557. In determining the reliability of an expert's testimony, a trial court may consider the following nonexhaustive list of factors: (1) the extent to which the theory has been or can be tested; (2) the extent to which the techniques rely on the subjective interpretation of the expert; (3) whether the theories have been subjected to peer review and/or publication; (4) the techniques' potential rate of error; (5) whether the underlying theories or techniques have been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses which have been made of the theories or techniques. *Id.* The Texas Supreme Court has noted the factors listed in *Robinson* do not apply with equal force to all types of scientific or technical evidence. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). We review the trial court's decision on a *Robinson* challenge for an abuse of discretion. *Robinson*, 923 S.W.2d at 558; *Tucker's Beverages, Inc. v. Fopay*, 145 S.W.3d 765, 767 (Tex. App.—Texarkana 2004, no pet.).

[12]Wal-Mart objected to Dr. Beyler's affidavit in its "Objections to Summary Judgment Evidence in Support of Plaintiffs' Response." Wal-Mart complained that Dr. Beyler's affidavit contained hearsay, was speculative, and was conclusory. Wal-Mart, though, did not complain about the scientific reliability of the affidavit and did not cite *Daubert*, *Robinson*, or their progeny. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993); *Robinson*, 923 S.W.3d 549.

13

scientific evidence is unreliable . . . a party must object to the evidence before trial or when the evidence is offered").

The Texas Supreme Court, in *Coastal Transportation*, explicitly refused to overrule *Maritime Overseas* and explained its holding in *Maritime Overseas* as follows:

> We concluded that examination of the expert's underlying methodology was a task for the trial court in its role as gatekeeper, and was not an analysis that should be undertaken for the first time on appeal. *Id.* at 412. This rule allows the trial court to exercise its discretion in making a determination of whether the expert testimony is sufficiently reliable. *Id.* It also ensures that a full record will be developed, and that appellate courts will be able to evaluate the legal and factual sufficiency of the evidence without looking beyond the appellate record. *Id.*

*Coastal Transp.*, 136 S.W.3d at 233. The court reaffirmed "that when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis." *Id.* By failing to raise the issue in the trial court, Wal-Mart has failed to preserve its complaints about the methodology for review. Because error is not preserved, we decline to address these arguments. We note *Coastal Transportation* held a party may challenge "[o]pinion testimony that is conclusory or speculative" for the first time on appeal because such testimony was "incompetent evidence." *Id.* at 232. We will address Wal-Mart's complaints that Dr. Beyler's testimony was speculative and conclusory.

The Texas Supreme Court has held that a speculative or conclusory statement of an expert witness is insufficient to create a question of fact to defeat summary judgment. *See IHS Cedars*

14

*Treatment Ctr. of Desoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 803 (Tex. 2004); *Coastal Transp.*, 136 S.W.3d at 232. A naked and unsupported opinion of a witness is incompetent evidence. *See Coastal Transp. Co.*, 136 S.W.3d at 232. "An expert opinion is conclusory when it offers an opinion with no factual substantiation. . . . . The expert must explain how he reached his conclusion." *Sparks v. Booth*, 232 S.W.3d 853, 863 (Tex. App.—Dallas 2007, no pet.) (citations omitted); *see Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 242 S.W.3d 67, 74 (Tex. App.—San Antonio 2007, pet. denied); *Beaumont v. Basham*, 205 S.W.3d 608, 621 (Tex. App.—Waco 2006, pet. denied).

In his report, Dr. Beyler states, "On the basis of the eyewitness observation, physical evidence and analysis of the fire, the fire was caused by the halogen torchiere lamp." Wal-Mart argues this conclusion demonstrates that Dr. Beyler's opinion is merely unsupported speculation. In *Volkswagen of America, Inc. v. Ramirez*, the Texas Supreme Court held an expert's opinion was conclusory when the expert based his opinion on the "laws of physics." 159 S.W.3d 897, 911 (Tex. 2004). When a party challenges the conclusory nature of an expert opinion, appellate courts look to the entire record, not to statements in isolation. *United Servs. Auto. Ass'n v. Croft*, 175 S.W.3d 457, 464 (Tex. App.—Dallas 2005, no pet.). Although Dr. Beyler's statement, when considered in isolation, might appear similar to the "laws of physics" statement in *Volkswagen*, consideration of the entire affidavit and supporting attachments demonstrates that Dr. Beyler's opinion has considerably more factual substantiation than the expert in *Volkswagen*.

15

Dr. Beyler's affidavit specifically incorporates his report, which was attached to the affidavit. The affidavit states, "[t]he basis of my opinions expressed herein and in my report are more fully developed and are contained in my report dated February 8, 2007, attached hereto." When we consider Dr. Beyler's affidavit in connection with the attached report, there is sufficient factual substantiation of Dr. Beyler's opinions.

Dr. Beyler used numerous published articles to establish general causation, i.e., the fact that halogen lamps can cause fires. Dr. Beyler listed an extensive list of articles and government reports on which he relied. Dr. Beyler relied upon research conducted by Underwriters Laboratories (UL) concerning halogen lamp temperatures. Dr. Beyler also relied upon sixteen articles, many of which have been published in scientific journals. The scientific literature established four main mechanisms by which halogen lamps can cause fires as documented by scientific literature: 1) ignition of combustibles in close proximity, 2) ignition of combustibles by exploding lamp fragments, 3) electrical short circuits, and 4) tip-over of the lamp resulting in ignition of combustibles. Dr. Beyler asserts that halogen lamps operate at very high temperatures and generate sufficient heat to allow ordinary combustibles to be ignited without direct bulb contact. Using scientific studies, he illustrated that combustibles within two or three inches from the bulb pose a serious risk of igniting. Logically, if the bulb itself, or fragments, come into direct contact with a combustible, the risk of igniting would be even greater.

16

Dr. Beyler established specific causation, i.e., that Charles II's halogen lamp was the cause of the fire, by elimination of other possible causes of the fire and evaluating the statements of the fact witnesses along with the evidence collected at the scene. Dr. Beyler concluded the "most likely mechanism" was "'nonpassive failure' of the lamp igniting the recliner below." Nonpassive failure involves an exploding bulb causing hot glass, capable of igniting ordinary combustibles like furniture, to ignite. Dr. Beyler's report contains an extensive recitation of the facts, including that the lamp lacked a wire mesh guard, was located adjacent to the recliner, and the ceiling had been penetrated by the fire in the area of the recliner. The report also noted that Whitlock stated the lamp was still on when he left his house around midnight the night of the fire. Dr. Beyler noted the sofa and small table were both damaged more extensively on the side closest to the lamp, and the halogen lamp was extensively damaged.

Wal-Mart argues Dr. Beyler failed to exclude other potential causes. But Dr. Beyler did examine and exclude the alternative causes. Dr. Beyler considered these possibilities, but rejected the candle theory because of the disparity between the damage to the recliner and the sofa. The pictures of the scene showed the recliner was completely consumed, but the sofa was only partially consumed. Dr. Beyler concluded the disparity demonstrated the fire did not originate at the table because the sofa was closer to the table. Dr. Beyler also states the candle wax would not have survived the fire if the candles were the point of origin. The conclusion that smoking materials caused the fire was incorrect according to Dr. Beyler. Dr. Beyler states that there is no evidence

17

smoking materials caused the fire and that "[t]he condition of the recliner after the fire is in no way indicative of ignition of the recliner by a cigarette." Further, Dr. Beyler found no evidence of electrical activities or other indicators of an electrical cause of the fire.

Wal-Mart argues Dr. Beyler's reasoning is inadmissible post hoc reasoning.[13] In *Merrell Dow Pharmaceuticals v. Havner*, the Texas Supreme Court stated "[p]ost hoc, speculative testimony will not suffice." 953 S.W.2d 706, 719 (Tex. 1997) (announcing requirements for epidemiological studies to prove causation in toxic tort case). As noted by the First District, the temporal sequence of the reasoning is not necessarily fatal. *See Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 613 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). The First District noted such "reasoning is sometimes correct, sometimes fallacious" and emphasized the speculative nature of the testimony as the relevant inquiry. *Id.*

All of the cases cited by Wal-Mart are distinguishable from the facts in this case. A number of the cases involved reviews of *Robinson* challenges, which as discussed above was not preserved for our review, and are of marginal relevance.[14] The remaining cases cited by Wal-Mart are factually

---

[13]Dr. Beyler's testimony is "post hoc" only in that he proposes several hypotheses, and then examines each in turn. This is not inadmissible reasoning; this is the scientific method.

[14]*Gammill*, 972 S.W.2d at 726 (applying *Robinson* to technical rather than scientific expert testimony); *Havner*, 953 S.W.2d at 712 (applying *Robinson* in the context of epidemiological studies); *Robinson*, 923 S.W.2d at 556; *Wolfson v. Bic Corp.*, 95 S.W.3d 527, 532 (Tex. App.—Houston [1st Dist.] 2002, writ denied). Wal-Mart also cites two federal cases. These cases do not rely upon Texas caselaw and have marginal, if any, persuasive value. *See Bryte v. Am. Household, Inc.*, 429 F.3d 469 (4th Cir. 2005); *Lanza v. Poretti*, 537 F. Supp. 777 (E.D. Pa. 1982).

18

distinguishable.  *Borg-Warner* concerned the level of proof required in toxic tort cases to show that the exposure was a "substantial factor" in bringing about the plaintiff's injury and has little relevance to this case.  *See Borg-Warner Corp. v. Flores*, 232 S.W.3d 765 (Tex. 2007).  In *Ridgway*, the expert witness only testified he "suspect[ed]" the electrical system caused the fire and failed to exclude other possible causes.  *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).  The Tyler Court of Appeals in *DeGrate* concluded the expert failed to provide any basis of support for his opinion the candles were defectively designed.  *See DeGrate v. Executive Imprints, Inc*., 261 S.W.3d 402, 411 (Tex. App.—Tyler 2008, no pet.).  In *Gonzales v. Shing Wai Brass & Metal Wares Factory, Ltd.*, there was no evidence "explain[ing] how the lamp was defective."  190 S.W.3d 742, 746 (Tex. App.—San Antonio 2005, no pet.).

At oral argument, Wal-Mart argued there was no distinction between this case and our recent opinion in *Driskill v. Ford Motor Co.*, No. 06-07-00119-CV, 2008 Tex. App. LEXIS 7910 (Tex. App.—Texarkana Oct. 17, 2008, no pet.).  We believe the distinctions between this case and *Driskill* are profound.  In *Driskill*, the plaintiff's expert witness was disqualified and there was no expert testimony "bridging the analytical gap between the origin of a fire in the left rear area of an engine compartment and the conclusion that the [speed control deactivation switch] in that area was the cause-in-fact of the fire."  *Id*.  This case does not contain the "analytical gap" which proved fatal in *Driskill*.  Dr. Beyler's affidavit provides expert testimony bridging the analytical gap between the

origin of the fire in the general area of the lamp and the conclusion that the halogen lamp was the cause-in-fact of the fire. There is more than a scintilla of evidence bridging the analytical gap.

It is clear that Wal-Mart's experts disagree with the conclusions reached by Dr. Beyler. Conclusory evidence lacks probative value due to insufficient factual substantiation—not from "differing conclusions as to the underlying factual situation." *See Brandt v. Surber*, 194 S.W.3d 108, 132 (Tex. App.—Corpus Christi 2006, pet. denied). The fact that an expert witness may have made errors does not create an impermissible "analytical gap." *See SAS & Assocs. v. Home Mktg. Servicing*, 168 S.W.3d 296, 300 (Tex. App.—Dallas 2005, pet. denied). While Dr. Beyler's analysis is not irrefutable, Dr. Beyler did provide factual substantiation for his opinions. Dr. Beyler's opinions were based on his knowledge, training, and experience as an expert in fire science and fire investigation, his review of the pictures of the scene, the statements of the fact witnesses, and numerous published articles. The evidence is not speculative or conclusory and does not contain an impermissible "analytical gap" between the data and the conclusions. Dr. Beyler's testimony is not incompetent evidence.

## C. Timeliness and Specificity of Self-Authentication of Wal-Mart Documents

Wal-Mart claims the Parents' exhibits 4 and 14 through 17 were not competent summary judgment evidence because they were not authenticated. In its appellee's brief and its objections to the Parents' summary judgment evidence, Wal-Mart argued to the trial court that it did not receive the ten days' notice required for self-authentication by Rule 193.7 of the Texas Rules of Civil

Procedure. *See* TEX. R. CIV. P. 193.7. The Parents responded that the exhibits were self-authenticated under the rule by a notice provided seventeen months before the summary judgment. The Parents filed a document titled "Notice of Self Authentication Pursuant to Rule 193.7, Tex. R. Civ. P.," which provides in pertinent part:

> Please take notice that the documents you produced in response to all parties' Request for Production of Documents are authenticated pursuant to Rule 193.7, TEX. R. CIV. P., and will be used by Plaintiff at any trial or hearing.

Clearly, Wal-Mart received more than ten days' notice.

In their response to the Parents' reply brief, Wal-Mart states it was represented by different counsel at the time of the notice and was not aware of the above notice. Wal-Mart, in the alternative, argues the above notice lacked sufficient specificity under the rule. According to Wal-Mart, the notice must list every document to be used by the document's title, etc. Such a requirement is not found in the text of the rule. Rule 193.7 provides in its entirety:

> A party's production of a document in response to written discovery authenticates the document for use against that party in any pretrial proceeding or at trial unless—within ten days or a longer or shorter time ordered by the court, after the producing party has actual notice that the document will be used—the party objects to the authenticity of the document, or any part of it, stating the specific basis for objection. An objection must be either on the record or in writing and must have a good faith factual and legal basis. An objection made to the authenticity of only part of a document does not affect the authenticity of the remainder. If objection is made, the party attempting to use the document should be given a reasonable opportunity to establish its authenticity.

TEX. R. CIV. P. 193.7. Wal-Mart proposes two arguments as to why we should infer a specificity requirement into the rule.

21

First, Wal-Mart argues the snap-back provisions of Rule 193.3(d) require such a requirement. *See* TEX. R. CIV. P. 193.3(d). Wal-Mart argues the notice of intent to use the document "also triggers the ability to 'snap back' an inadvertently produced privileged document." Second, Wal-Mart argues the comments to the rule indicate the notice must specify the document by title. The only comment referencing Rule 193.7 is as follows:

> 7. The self-authenticating provision is new. Authentication is, of course, but a condition precedent to admissibility and does not establish admissibility. *See* TEX. R. EVID. 901(a). The ten-day period allowed for objection to authenticity (which period may be altered by the court in appropriate circumstances) does not run from the production of the material or information but from the party's actual awareness that the document will be used. To avoid complications at trial, a party may identify prior to trial the documents intended to be offered, thereby triggering the obligation to object to authenticity. A trial court may also order this procedure. An objection to authenticity must be made in good faith.

TEX. R. CIV. P. 193 cmt. 7. Wal-Mart claims the language "may identify" creates a specificity requirement that requires a party to list the specific document he or she intends to use.

Assuming, without deciding, the rule contains a specificity requirement, Wal-Mart has waived any error. The Parents filed the notice of self-authentication approximately seventeen months before summary judgment. If Wal-Mart had any complaints concerning the notice, it should have raised those complaints in the trial court at a time when any deficiency could have been remedied. Wal-Mart did not raise its specificity complaint until it filed its response to the Parents' reply brief. "Silence or inaction, for so long a period as to show an intention to yield the known right," may be sufficient to establish a waiver of that right. *Tenneco Inc. v. Enter. Prods. Co.*, 925

22

S.W.2d 640, 643 (Tex. 1996). Wal-Mart had seventeen months in the trial court to complain about the notice of self-authentication. Wal-Mart waived any complaints by not objecting to the specificity of the notice in the trial court.

## II. The Trial Court Erred in Granting the No-Evidence Motion

Wal-Mart argues there are numerous deficiencies in the Parents' evidence. "A product may be unreasonably dangerous because of a defect in manufacturing, design, or marketing." *Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 335. Wal-Mart claims there is no evidence the lamp was a halogen lamp, no evidence the lamp was purchased at a Wal-Mart store, no evidence the lamp contained a design defect, and no evidence of a marketing defect.

A no-evidence summary judgment is essentially a pretrial directed verdict. We, therefore, apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). We must determine whether the nonmovant produced any evidence of probative force to raise a fact issue on the material questions presented. *Id.*; *Vial v. Gas Solutions, Ltd.*, 187 S.W.3d 220, 228 (Tex. App.—Texarkana 2006, no pet.). A no-evidence

> motion for summary judgment must be granted if: (1) the moving party asserts that there is no evidence of one or more specified elements of a claim or defense on which the adverse party would have the burden of proof at trial; and (2) the respondent produces no summary judgment evidence raising a genuine issue of material fact on those elements.

*Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006); *see* TEX. R. CIV. P. 166a(i).

23

A nonmovant will defeat a no-evidence summary judgment motion if the nonmovant presents more than a scintilla of probative evidence on each element of his or her claim. *DR Partners v. Floyd*, 228 S.W.3d 493 (Tex. App.—Texarkana 2007, pet. denied); *Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner*, 953 S.W.2d at 711. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

### A.    There Is Some Evidence the Lamp Was a Halogen Lamp

Wal-Mart argues there is no evidence the lamp purchased by Merrell for his son was a halogen lamp. A halogen lamp uses "halogen gas in the bulb as a media for producing the light." An incandescent bulb consists of a sealed vacuum. The proof of this fact is critical to the Parents' case. Without evidence the lamp was a halogen lamp, there is no evidence of a product defect or causation.

Merrell provided some evidence that the lamp was actually a halogen lamp. During the deposition, Merrell testified the lamp he purchased for his son was a halogen lamp and frequently

24

referred to the lamp as a halogen lamp. Merrell also testified he could distinguish the difference between an incandescent bulb and a halogen bulb. Merrell described the bulb in the lamp as a "round cylinder looking bulb"—"[n]ot like a regular light bulb." According to Merrell, a halogen bulb is normally cylindrical, and an incandescent bulb is normally round. Merrell, though, testified he did not know the wattage of the bulb. Merrell testified he had seen the lamp in that location about a month before the fire, and "it was like looking at the sun."

J. M. Bershirs, who had been hired by the landlord to remove items from the burned house, testified that the bulb on the lamp he removed from the living room was "more flat on the surface and then round at the back." Bershirs testified the bulb was similar to a flood lamp. Bershirs later identified a drawing of a bulb as similar to the bulb in the lamp. Bershirs testified he was not sure whether the bulb was a halogen or incandescent bulb.

The evidence that the lamp at issue was a halogen lamp is more than a mere suspicion or surmise. Merrell's testimony is more than a scintilla of evidence the lamp at issue was a halogen lamp. The description of the bulb by Bershirs also suggests the lamp was a halogen lamp. We conclude there is more than a scintilla of evidence the lamp at issue was a halogen lamp.

**B.      There Is Some Evidence the Halogen Lamp Was Purchased at Wal-Mart**

Wal-Mart argues there is no evidence that the lamp was purchased at Wal-Mart because the Parents do not have any document establishing the purchase. Merrell testified that he purchased the

lamp at a Wal-Mart store even though he did not remember the location. Merrell's testimony that he purchased the lamp at Wal-Mart is sufficient to create a fact issue.

### C. There Is Some Evidence of a Design Defect

Wal-Mart argues there is no evidence of a design defect. We note Wal-Mart also argues the Parents waived this issue by failing to provide this Court with an adequate brief.[15] We also note the Parents claim Wal-Mart waived this issue by not raising it in the trial court.[16]

A design defect exists when a condition of the product renders it "'unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use.'"

---

[15]Wal-Mart argues the Appellants' brief lacks sufficient citations to authority. An appellant can waive an issue by failing to provide adequate citations to authority. *See* TEX. R. APP. P. 38.1; *Save Our Springs Alliance, Inc. v. Lazy Nine Mun. Util. Dist.*, 198 S.W.3d 300, 314 n.9 (Tex. App.—Texarkana 2006, pet. denied). Whether a party has provided adequate citations to authority is not judged by the quantity of cases cited. What constitutes adequate citations to authority depends on the issue raised. For some issues, citing a single case may be adequate briefing. *See Save Our Springs*, 198 S.W.3d at 324 (op. on reh'g). For complex issues or issues where the law is unsettled, numerous cases along with extensive discussion of those cases may be required in order to adequately brief the issue. *See id.* The Parents provided adequate authority for the arguments raised. While the authority cited by the Appellants' brief could have been more extensive, the brief is not inadequate.

[16]A movant must establish his or her entitlement to a summary judgment on the issues expressly presented to the trial court. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671 (Tex. 1979). Wal-Mart, though, did expressly present this issue to the trial court in its motion for summary judgment. Wal-Mart's motion contains three main complaints: 1) no evidence the lamp was purchased at Wal-Mart; 2) no evidence the lamp was "defective and/or unreasonably dangerous"; and 3) no evidence a product defect caused the injury. Wal-Mart argued there was no evidence of a product defect because a product defect cannot be inferred, and "an inherent risk (such as a high temperature bulb)" is not evidence the product is unreasonably dangerous. Wal-Mart's challenge to the design defect is preserved, but Wal-Mart is limited to the grounds alleged in its motion.

26

*Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 258 (Tex. 1999) (quoting jury instruction contained in *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 847 n.1 (Tex. 1979)). "'The inference of defect may not be drawn . . . from the mere fact of a product-related accident.'" *Ridgway*, 135 S.W.3d at 602 (quoting Restatement (Third) of Torts: Products Liability § 3 reporters' note to cmt. d (1998)); *see Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 807 (Tex. 2006).

We note a design defect also requires proof of a safer alternative design. TEX. CIV. PRAC. & REM. CODE ANN. § 82.005 (Vernon 2005); *Mendez*, 204 S.W.3d at 807; *see Jaimes v. Fiesta Mart, Inc.*, 21 S.W.3d 301, 306 (Tex. App.—Houston [1st Dist.] 1999, pet. denied); *Hernandez*, 2 S.W.3d at 256 (noting "Section 82.005 does not attempt to state all the elements of a product liability action for design defect"). Wal-Mart, though, did not challenge the evidence concerning a safer alternative design.[17]

_____

[17]Wal-Mart did not argue there was no evidence of a safer alternative design, nor did Wal-Mart argue its evidence conclusively established there was no safer alternative design. Summary judgment cannot be granted except on the grounds expressly presented in the motion. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex. 2002); *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 912 (Tex. 1997); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex. 1993); *AIG Life Ins. Co. v. Federated Mut. Ins. Co.*, 200 S.W.3d 280, 284 (Tex. App.—Dallas 2006, pet. denied); *Thomas v. Omar Invs., Inc.*, 156 S.W.3d 681, 685 (Tex. App.—Dallas 2005, no pet.). Rule 166a(i) provides "[t]he motion must state the elements as to which there is no evidence." TEX. R. CIV. P. 166a(i). "A motion for summary judgment must itself expressly present the grounds upon which it is made, and must stand or fall on these grounds alone." *Martinez*, 941 S.W.2d at 912 (quoting *McConnell*, 858 S.W.2d at 341). The appellate court is not permitted to "read between the lines, infer or glean from the pleadings or the proof" any grounds for granting summary judgment other than those grounds expressly set forth in the motion for summary judgment. *McConnell*, 858 S.W.2d at 343; *Mott v. Red's Safe & Lock Servs., Inc.*, 249 S.W.3d 90, 98 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (motion which alleged there was no evidence the product "was unfit for the purposes for which it was intended . . . ." was insufficient to challenge existence of product defect

### 1.    There Is Some Evidence of a Product Defect

According to Dr. Beyler, all halogen lamps are defective and unreasonably dangerous because typical "lamp envelope" temperatures are between 500 and 600 degrees Celsius (932 and 1,112 degrees Fahrenheit). There are four main mechanisms by which halogen lamps can cause fires as documented by scientific literature:  1) ignition of combustibles in close proximity; 2) ignition of combustibles by exploding lamp fragments; 3) electrical short circuits; and 4) tip-over of the lamp resulting in ignition of combustibles. There is more than a scintilla of evidence that the lamp contained a product defect.

### 2.    There Is Some Evidence Halogen Lamps Are Unreasonably Dangerous

Wal-Mart challenges the evidence that halogen lamps are unreasonably dangerous. Dr. Beyler's affidavit contains some evidence of this element. The Parents introduced numerous articles showing halogen lamps produce high levels of heat. A memorandum from the Commission lists these dangers. The memorandum was the result of 260 reported incidents involving halogen torchiere floor lamps. The study included 232 fires caused by halogen torchiere-style floor lamps, of which twelve resulted in deaths.

---

or unreasonably dangerous condition). Because Wal-Mart failed to challenge the evidence concerning a safer alternative design in its summary judgment motion, summary judgment could not be granted on that basis. Further, we note Dr. Beyler stated incandescent and flourescent bulbs do not generate temperatures as high as halogen bulbs. Lentini and Phillips both testified similar lamps with incandescent bulbs were available.

The unreasonably dangerous concept is similar to the safer alternative design discussion above, but has a slightly different focus. Even though a product may have a safer alternative design, the product may not be unreasonably dangerous based on a risk-utility analysis. *See Hernandez*, 2 S.W.3d at 256. The risk-utility analysis employed by Texas courts involves consideration of several factors, including:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions, and (5) the expectations of the ordinary consumer.

*Id.* (citing *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex. 1997)).

Wal-Mart argues that the Parents' proof, which only attacks halogen torchiere lamps in general, does not establish that the product is unreasonably dangerous. Wal-Mart claims the model sold must be unreasonably dangerous in comparison to other halogen torchiere lamps. A rational juror could conclude that an incandescent torchiere lamp is an adequate substitute for a halogen torchiere lamp and determine, using the above factors, that the utility of halogen lights does not outweigh its dangers. There is some evidence of unreasonable danger.

### 3. There Is Some Evidence of Causation

Wal-Mart claims there is no evidence the lamp in dispute caused the fire. Wal-Mart argues the Parents cannot prove causation without producing the actual lamp. While we agree the missing lamp makes the Parents' case much more difficult to prove, its absence does not make the case impossible to prove. We have previously discussed the testimony of Dr. Beyler supporting the claim that the halogen lamp was the cause of the fire.

As discussed above, Dr. Beyler opined the fire was most likely caused by the halogen lamp and substantiated his opinion with an analysis of the fire, physical evidence, and observations. Dr. Beyler used numerous published articles to establish that halogen lamps can cause fires. Based on the data and statistics contained in the published articles, Dr. Beyler concluded "halogen lamps generate sufficient heat to allow ordinary combustibles to be ignited without direct bulb contact." Dr. Beyler concluded the most likely mechanism is "'nonpassive failure' of the lamp igniting the recliner below." He reached this conclusion by eliminating the other possible causes of the fire and analyzing the statements of the fact witnesses along with the evidence gathered at the scene. We further note the ceiling burn-through was not directly over the recliner, but rather approximately two feet from the recliner. Dr. Beyler's testimony was based on the condition of the recliner, sofa, and table after the fire.

The Parents were not required to marshal all of their evidence at the summary judgment stage. *See* TEX. R. CIV. P. 166a (cmt.). The Parents only had to produce a scintilla of evidence.

30

There is some evidence the lamp was a substantial factor in bringing about an injury and without the lamp, the injury would not have occurred.

**D.     There Is Some Evidence of a Marketing Defect**

A "marketing defect" exists if the manufacturer or seller fails to warn of a dangerous characteristic of the product.  A marketing defect may exist even though the product is not otherwise flawed.  *Munoz v. Gulf Oil Co.*, 732 S.W.2d 62, 65 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.).  A marketing defect consists of five elements:

> (1) a risk of harm that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product must exist; (2) the product supplier must actually know or reasonably foresee the risk of harm at the time the product is marketed; (3) the product must possess a marketing defect; (4) the absence of the warning and/or instructions must render the product unreasonably dangerous to the ultimate user or consumer of the product; and (5) the failure to warn and/or instruct must constitute a causative nexus in the product user's injury.

*Goodyear Tire & Rubber Co. v. Rios*, 143 S.W.3d 107, 116 (Tex. App.—San Antonio 2004, pet. denied).

As discussed above, the record contains ample evidence halogen lamps are defective.  There is some evidence establishing that Wal-Mart was aware of the risk of harm.  The record contains several memorandums and other documents concerning Wal-Mart's implementation of a requirement imposed by the Commission that all retailers make available without cost, a wire mesh guard for all halogen torchiere lamps.  However, Wal-Mart did not provide a wire mesh guard with the lamp.  Merrell testified Wal-Mart sold the lamp without a box or adequate warnings.  A rational juror could

conclude a causative nexus existed between the failure to warn and/or instruct and Charles II's death. There is more than a scintilla of evidence establishing a marketing defect.

### III. The Trial Court Erred in Granting the Traditional Motion for Summary Judgment

Wal-Mart's motion was both a no-evidence and a traditional motion for summary judgment. The Parents argue that Wal-Mart failed to conclusively establish that the lamp was not purchased at Wal-Mart, that the lamp was an incandescent lamp, or that smoking materials were the cause of the fire. We agree the trial court erred in granting the traditional motion for summary judgment.

When reviewing a traditional motion for summary judgment, summary judgment is proper when the movant establishes that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Clear Creek Basin Auth.*, 589 S.W.2d 671; *see* TEX. R. CIV. P. 166a(c). The defendant must conclusively negate at least one element of each of the plaintiff's theories of recovery or plead and conclusively establish each element of an affirmative defense. *Martinez*, 941 S.W.2d at 911. Because the movant bears the burden of proof, all conflicts in the evidence are disregarded, evidence favorable to the nonmovant is taken as true, and all doubts as to the genuine issues of material fact are resolved in favor of the nonmovant. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546 (Tex. 1985); *see Limestone Prods. Distribution, Inc. v. McNamara*, 71 S.W.3d 308, 311 (Tex. 2002); *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999).

### A. Wal-Mart Did Not Conclusively Negate That the Lamp Was Purchased at Wal-Mart

Wal-Mart introduced an affidavit of Jim Scantlin, the Director of Data Management for Wal-Mart. Scantlin searched Wal-Mart's records for a record of Merrell's purchase. Scantlin testified he reviewed 95,000 sales records from the three locations in question and could not find a sale that matched Merrell's description. A jury would not be required to find all of Scantlin's testimony to be credible. As a Wal-Mart employee, Scantlin was an interested witness. In addition, Scantlin restricted his search to specific dates, product features, and other criteria. Merrell's purchase could have been outside these dates or the other search limitations. The Parents argue a purchase on October 8 could have been the purchase of the lamp in question. This date was outside the search dates used by Scantlin. Last, Merrell testified he purchased the lamp at Wal-Mart. While Wal-Mart has persuasive evidence, it has not conclusively established the lamp was not purchased at Wal-Mart. There are genuine issues of material fact concerning whether the lamp was purchased at Wal-Mart.

### B. Wal-Mart Did Not Conclusively Negate That the Lamp Was a Halogen Lamp

Both Lentini and Dyer testified the lamp was an incandescent lamp. Lentini testified the two photographs of the lamp were of an incandescent fixture, not a halogen fixture. From the descriptions of the lamp and the photographs, Dyer concluded the lamp indicated was an incandescent, rather than a halogen, lamp. Dyer testified the shape of the bowl indicates the lamp was an incandescent lamp. The record, though, contains evidence contradicting the conclusions reached by Lentini and Dyer. In its summary judgment motion, Wal-Mart admits the photographs

33

of the lamp are "blurry" and "fuzzy." Phillips testified a person could buy both incandescent lamps and halogen lamps similar to the appearance of the lamp in dispute. As discussed above, Merrell testified the lamp was a halogen lamp. Wal-Mart admitted selling halogen lamps. The testimony of an expert witness usually does not establish any fact as a matter of law. *See Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 338. Wal-Mart failed to conclusively establish the lamp was an incandescent lamp.

### C. Wal-Mart Did Not Conclusively Establish the Marihuana Joints Caused the Fire

Wal-Mart argues throughout its brief that the marihuana joints or cigarettes caused the fire. Wal-Mart, though, has not conclusively established this fact. Lentini concluded the most probable cause of the fire was careless disposal of smoking materials. Dyer testified the cause of the fire could not be determined due to the lack of a thorough fire investigation and the significant amount of missing elements of key evidence.

The presence of smoking materials is not conclusive evidence they were the cause of the fire. Neither is the presence of cannabinoids in the blood of the victims. Dr. Beyler disagreed with the conclusion that marihuana joints or other smoking materials caused the fire. While Lentini opined the fire was caused by smoking materials, such testimony only creates a fact issue for a jury's consideration. In other words, Wal-Mart's evidence creates a fact issue—not conclusive proof.

**Conclusion**

The trial court did not err in admitting all the summary judgment evidence. Although Whitlock's affidavit was not admissible for all purposes, Dr. Beyler could rely upon Whitlock's statement in his affidavit. Dr. Beyler's affidavit was not speculative or conclusory. Because the Parents introduced more than a scintilla of evidence on each challenged element of their cause of action, the trial court erred in granting Wal-Mart's no-evidence motion for summary judgment. Further, Wal-Mart failed to establish it was entitled to a traditional summary judgment. We reverse the order of the trial court granting Wal-Mart's summary judgment motion and remand this case to the trial court for further proceedings consistent with this opinion.


Jack Carter
Justice

Date Submitted:     October 29, 2008
Date Decided:       December 16, 2008

35