

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-13-00141-CV

CRESSON SWD SERVICES, L.P.                                APPELLANTS
AND DJ PULLING, P.C.

V.

BASIC ENERGY SERVICES, L.P.                               APPELLEE

----------

FROM THE 415TH DISTRICT COURT OF PARKER COUNTY
TRIAL COURT NO. CV11-1146

----------

## MEMORANDUM OPINION[1]

----------

Appellants Cresson SWD Services, L.P. and DJ Pulling, P.C. (collectively,

Cresson) owned a commercial saltwater disposal well[2] and agreed to make

improvements to the well—including deepening the injection zone, putting in a

---

[1]*See* Tex. R. App. P. 47.4.

[2]Cresson went through bankruptcy before the trial, and its only remaining assets were this lawsuit and some equipment at the well site.

liner, and cleaning out the hole to 8,600 feet—to settle a dispute with its natural-gas-well-operating neighbor. Appellee Basic Energy Services, L.P. orally agreed to work on the well, Cresson sued Basic for breach of the oral agreement, and the jury found that Basic did not breach the agreement.

In its fourth and fifth issues, Cresson argues that there is no evidence to support the jury's finding that Basic did not breach the agreement and that this finding is against the great weight and preponderance of the evidence.[3] Question No. 2 stated, "You are instructed that [Basic] agreed with [Cresson] to re-work the Cresson well.[4] Did [Cresson] prove by a preponderance of the evidence that [Basic] failed to comply with the agreement?" The jury replied, "No." To answer the question, the jury had to infer the oral agreement's terms from the evidence and then determine whether Basic had breached the agreement.[5]

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to

---

[3]Cresson's first, second, and third issues pertain to the jury's indemnity finding. *See* Tex. R. App. P. 47.1.

[4]Before Basic began its case-in-chief, the parties agreed that they had an agreement that Basic would work on the well.

[5]Cresson tendered a proposed jury question that addressed the agreement's scope but the trial court did not submit that instruction and Cresson does not complain about its exclusion on appeal.

2

prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

3

The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

Cresson contends that the evidence shows that Basic agreed to deepen the well to 8,600 feet, did not do so, and did not offer to complete the work.[6] Basic responds that the evidence shows that the agreement to deepen the well did not include a guarantee of success and that Basic worked on the well until Cresson decided not to spend any more money on the project.

Mahmood Siddiqui, David Pulling, and the other individuals involved in Cresson lacked experience in the oil and gas industry; they engaged Jerry Lack, a consultant, for his technical understanding of well operations and to be the "go-to" person to oversee contractor work on several wells before entering the agreement with Basic.

---

[6]Question No. 1 asked, "Did Defendant prove by a preponderance of the evidence that Plaintiff and Defendant agreed to the terms and conditions set forth on the attached legal size, double-sided page?" The attached document was a copy of the terms and conditions on the back of Basic's daily work tickets. The jury answered "yes," to Question No. 1.

Cresson now argues that the trial court improperly submitted Question No. 1 before Question No. 2, thereby adding the terms to the agreement. However, Cresson did not object at the charge conference to the trial court's arrangement of the questions or complain that a "yes" answer to Question No. 1 would add the terms to the agreement referenced in Question No. 2. *See* Tex. R. Civ. P. 274; *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (op. on reh'g). Further, Question No. 2 was not conditioned on a "yes" response to Question No. 1, and the work ticket terms and conditions—which pertain to insurance and payment terms, risk allocation, equipment conditions, permits, and compliance with applicable laws and regulations—had no bearing on the jury's overall determination of liability for failure to comply with the agreement.

4

Lack, who had been an oil and gas consultant since 1979, testified that generally, when hired, he would line up vendors for the project after finding out what needed to be done, coordinate the logistics, equipment, and personnel, and then supervise the on-site activities to make sure that everyone understood what the company wanted done and that the work was completed accordingly. Lack stated that he was responsible for following the company's directions and seeing that the work was done to the company's satisfaction "based on the tools, the information that's given [to him]." Oil and gas companies hired him "to take care of whatever activities they need[ed] supervised in the field," which could be direct on-site supervision, preparing estimated costs, drilling completion procedures, workover procedures, or anything else necessary to an operation—work that in the past had been handled by a company representative (hence the moniker "company man"). Lack had an oral agreement with Cresson for his daily rate plus expenses and acted in the "company man" role for Cresson for the well work here and at one of Cresson's other wells.

Duane Thomas, one of Basic's rig managers, testified that Siddiqui told him that Lack would take care of the consultant work on the project, which Thomas understood to mean that Lack "would be calling the shots on how we would do things." Mike Barter, one of Basic's contractors, stated that Lack directed the work on the well and that "[i]t was . . . part of [Lack's] duties to make all the decisions. Nothing was done without his expressed order."

Before starting the job, Lack was not told that the well was anything other than a "straight hole," i.e., a well with no deviation from vertical.[7]  Lack had given Cresson an estimate of how long the work would take and a total cost estimate of $344,210—of which Basic's work would be a portion—for a straight (vertical) well.[8]

When Lack called Thomas and asked if he had a rig available to pull the pipe out of the well, Lack did not share any of the specifics of the workover plan with Thomas other than they were going to clean out the bottom of the well and attempt to run a liner in the hole.[9]  Thomas sent a rig out and pulled the tubing

[7]The trial court admitted an August 25, 2008 email from Siddiqui to Lack that contained an attachment with the description of the work that Cresson and its gas-well neighbor had agreed upon:  (1) setting a liner of 1,000 feet inside the well's existing casing to a depth of 7,720 feet, which included cleaning out the well to 8,600 feet and setting a packer at 7,620 feet or lower; (2) cementing the liner and running a cement bond log on the well to confirm bond's quality; and (3) following the outlined program of work and conducting a pressure test according to the Railroad Commission Form H-5's instructions.

[8]Phillip Boren of Basic testified that he and Siddiqui did not discuss the total cost of the work; he did not recall giving an estimate but said that generally, at a minimum, it could have been a several-hundred-thousand-dollar job. Siddiqui testified that Basic had agreed to a water-disposal credit as payment for the work.  Siddiqui and Lack both testified that Lack did not know the details of Cresson's agreement with Basic.  Lack testified that he signed the daily work tickets to show that workers had showed up and completed various tasks but that he was unaware of the financial arrangements or any discounts negotiated between the parties and did not know what the ultimate amounts on the invoice would be.

[9]Thomas testified that he did not know the terms of the parties' agreement. One of Basic's contractors testified that he had written in his report a depth of 8,600, which he presumed is what Lack told him was the target depth Basic needed to reach.

6

out of the hole on October 10. On October 25, Thomas sent out the same rig for the clean-out portion of the work. Thomas said that he collected the daily work tickets, which Lack signed to verify that the work had been done and accepted by him as the owner's representative.

Lack said that an obstruction was encountered while drilling on October 27. On October 28, they attempted to drill through it and lost part of the drill bit in the hole. Lack asked Thomas to bring a magnet to fish the drill bit fragment out, but this effort was unsuccessful. Thomas stated that per Lack and Siddiqui's decision, work continued anyway. Lack testified that at that point, he still thought they were dealing with a straight hole; the rig crew did what he instructed them to do.

On October 31, the drill became stuck. After several days of trying to dislodge it, Lack called for Barter, one of Basic's "fishermen," to try to recover the equipment that had gone downhole, but this also proved to be unsuccessful.

On November 4, Basic's employees pulled a whipstock out of the hole; Lack told Thomas no one had known that the whipstock was down there.[10] Lack testified that his reaction when he saw the whipstock was, "Where the hell [did]

_____

[10]Lack explained that when drilling reveals an in-ground obstruction, an option to continue the well bore is to cut a "window" in the side of the well casing and insert a whipstock, a metal device that diverts the path of the original bore to one side and through the window, "sidetracking" the well past the obstruction. Lack said that if he had known before drilling that the Cresson well had been sidetracked, he would have known what to look for and his approach would have been more cautious.

7

this come from?" He told Thomas that he was going to have to talk with Siddiqui to see how they were going to proceed, and he called a meeting for the next day.

On November 5, Siddiqui, Pulling, Lack, Thomas, Barter, and Steve Wild (Basic's "head fishing rental tool guy") met to discuss the problems that had arisen, the potential solutions, how much they would cost, and the probability of success. Barter said that Lack led the discussion and that

> [w]e—they explained to the owners that what we found was—was whipstock, which was a big surprise, and explained the difficulties that we were going to have in trying to either get those other tools out of the well or even—or to complete this—to get down to this depth that they wanted to get to. And it was—it was—it was going to represent a lot of money. And the primary message—the primary reason we had the meeting was to explain this to them to see how far they wanted to pursue it.

Lack testified that he told Siddiqui and Pulling at the meeting that Cresson's options were that they

> [c]ould continue to spend money and try and fish that out, but we didn't think the success of that would be forthcoming, being that the—the top of the fish was outside the pipe now. And we had already made, you know, several attempts, it turns out, to fish it out with no success. So the only other option was set another—set another whipstock and to plug that bottom part, offset another whipstock, and go another direction.

Lack said that he called the meeting to give Cresson its options because it was a financial decision that the Cresson partners had to make with regard to continuing "to try and fish it or . . . cut another window or what?" stated, "[W]e just recommended that, let's just—get release—get everybody off the payroll, and then they . . . get together and make up their mind what they want to do."

8

Siddiqui said that no one said anything about whether Basic would be able to complete the work, and Pulling testified that the Basic representatives gave him the impression that "they could work on it forever and they may get it out and they may not."

Lack testified that at the meeting, he informed Pulling and Siddiqui that it could cost $200,000 or more, and Barter said that the ballpark figures mentioned at the meeting ran from $100,000 to $200,000 and that Cresson's people indicated that they could not make any commitment at that time. Pulling testified in rebuttal that he did not recall any Basic employees telling him at the November 5 meeting that Basic could finish the work for $100,000 to $200,000; that if they had, he would have told them to finish the job without hesitation because he had $200,000 available; and that Basic never gave him the option to tell them to keep going on the project.

When Barter left the meeting, no decisions had been made; Basic's employees were waiting on orders. Later that afternoon, an order was issued to rig down the equipment, but Barter said that he did not know who issued the order. Thomas stated that the day after the whipstock was discovered, Lack called him and said that they were not going to spend any more money on the well at this time and were going to rig down. Thomas subsequently spoke with Siddiqui about payment, and Siddiqui told him that he would have to get with his partners to see about getting the money.

9

Pulling said that at the end of the meeting, no one from Basic indicated that they were going to continue the work, and Cresson's management was examining its options if the well could not be salvaged. After the meeting, Basic removed its rig and demanded payment. Lack stated that his only conversations with Basic employees "after that meeting and we released everybody was trying to get ahold of Sid[diqui] and collect."

Siddiqui stated that no one from Basic ever promised him that the reworking would be successful regardless of conditions encountered in the well. Boren stated that he never guaranteed that the well's workover would be successful and that in the oil service business "[y]ou don't make a guarantee that you're going to provide a well that's in any shape . . . [and] you don't guarantee anything when you're working down a hole." Lack likewise testified that he never guaranteed anything, stating, "I've been in the business a long time, and I know that you can't use a guarantee. I mean, that's—you just don't do that. . . . You try and expect the best, but things happen, and no one can, you know, foresee some of these things." Lack stated that in his opinion, Basic's employees at the Cresson well site performed their work according to generally accepted oil field standards and satisfied his expectations.

From the evidence set out above, the jury could have determined that the parties' agreement was, as argued by Basic in its closing argument, for Basic's employees to do what Lack—as Cresson's consultant—told them to do and that

10

Basic's employees complied with Lack's directions to work on the project and then to stop working on it. And the jury could have reasonably found that the decision not to continue with the reworking was Cresson's, not Basic's. Therefore, we conclude that the evidence is legally sufficient to support the jury's finding on liability, and because the jury was the sole judge of the witnesses' credibility, we likewise conclude that the evidence is factually sufficient to support the finding. We overrule Cresson's fourth and fifth issues and do not reach Cresson's remaining issues. *See* Tex. R. App. P. 47.1.

Having overruled Cresson's dispositive issues, we affirm the trial court's judgment.

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL: MCCOY, MEIER and GABRIEL, JJ.

DELIVERED: November 26, 2014

11